292 So.2d 859 (1974)
Leroy MATURIN et ux.
v.
SCOTTY BRICK CO. et al.
No. 9711.
Court of Appeal of Louisiana, First Circuit.
March 18, 1974.
Rehearing Denied April 22, 1974.
Writ Refused June 7, 1974.
Bob F. Wright, Lafayette, Edmond L. Deramee, Thibodaux, L. Albert Forrest, L. Hallman Woods, New Iberia, for appellants.
Robert D. Morvant, Thibodaux, for James Quatroy and Jules Langla, and United States Fidelity & Guaranty Co.
Wood Brown, III, New Orleans, for Scotty Brick Co. & Reliance Ins. Co.
Francis G. Weller, New Orleans, for Continental Casualty Co.
Before LOTTINGER, BLANCHE and CRAIN, JJ.
BLANCHE, Judge.
This suit arises out of an accident involving two automobiles and a trailer truck loaded with 64,000 pounds of stones which occurred on April 14, 1967, on a rainy night. In attempting to make a "U" turn on Louisiana Highway No. 1 near Raceland, Louisiana, the truck driver, Isaiah Viney, blocked with his vehicle the lane of travel of a 1965 Ford Galaxie driven by Daniel Walker. The Walker vehicle collided with the truck, after which a rearend collision occurred between the Walker automobile and a following 1966 Chevrolet being driven by Jules Langla. Plaintiffs, Leroy Maturin and Gloria Breaux Maturin, his wife, were riding as passengers in the back seat of the Langla automobile and filed this suit to recover damages for their injuries. Because Mrs. Maturin died after trial and prior to the rendition of judgment, her father, George Breaux, was joined as a party plaintiff and his claim *860 judicially recognized to an undivided one-fourth interest in any award of damages obtained by Leroy Maturin.[1]
Cited as defendants are Isaiah Viney, Scotty Brick Company and Reliance Insurance Company, driver, owner and liability insurer of the truck, respectively; Jules J. Langla, United States Fidelity and Guaranty Company and Continental Casualty Company, driver and liability insurers of the Chevrolet automobile, respectively;[2] and Earl Walker, owner of the Ford being driven by his minor son, Daniel Walker.
The Maturin case was tried with a consolidated case filed by Langla and his wife. The trial judge took the cases under advisement after the trial and subsequently rendered judgment in the Maturin case, the only case before us on appeal, for plaintiff, Leroy Maturin, as head and master of the community of acquets and gains formerly existing between him and his wife, against Isaiah Viney, Scotty Brick Company and Reliance Insurance Company in the sum of $8,077.97 ($6,500 for his injuries, plus special damages); judgment recognizing the substituted plaintiff, George Breaux, as owner of an undivided one-fourth interest in the award of $8,077.97 to Maturin; judgment for Leroy Maturin, pursuant to stipulation, for the injuries to his deceased wife, against the aforementioned three defendants in the sum of $650; judgment dismissing plaintiff's suit as to all other defendants and further dismissing the third party demands of Scotty Brick Company and Reliance Insurance Company against Jules J. Langla, Earl Walker, Daniel Walker, United States Fidelity & Guaranty Company and Continental Casualty Company.
From this judgment plaintiff, Leroy Maturin, and substituted plaintiff, George Breaux, have devolutively appealed.
Plaintiffs set forth three specifications of error on appeal: (1) that the trial court failed to causally connect Leroy Maturin's traumatic epilepsy with the accident and thus awarded an inadequate sum for his damages; (2) that the final judgment signed by the trial court reflects an incorrect mathematical total of the general damages for Gloria Maturin and Leroy Maturin when added to the special damages; (3) that the trial court failed to award and fix the expert witness fees for Maturin's medical experts and attendant court reporter costs.
The trial court found that the negligence of the truck driver, Isaiah Viney, was the sole and proximate cause of the two accidents involved herein and the resultant injuries, exonerating Walker and Langla, drivers of the other two vehicles., from any negligence whatsoever. Since this finding is not at issue on appeal, our review of the record is limited to the trial court's award of general and special damages for Leroy Maturin and Gloria Maturin, together with the matter of expert witness fees and court reporter costs.
Although plaintiff Maturin claims to have suffered a serious head injury as a result of the accident, the trial judge apparently concluded otherwise, as he failed to award plaintiff damages for traumatic epilepsy. Plaintiff testified that he was thrown about in the car by the braking action of Langla. As Langla applied and released the brakes on three different brake applications, Maturin, who was seated on *861 the rear seat and had just unbuckled his safety belt, was thrown forward into the front seat and back again each time. On the first braking action a shaving kit located on the "shelf" between the rear seat and the rear car window allegedly flew off the shelf, striking Maturin on the right side of the head. Plaintiff claims that he was dazed and groggy after the accident to such an extent that he was unaware he had been burned on the arm by a flare which he was using to warn approaching traffic. The investigating officer at the scene of the accident indicated there were "zero injuries" for the reason that no one claimed to be hurt. The impact between the Langla and Walker vehicles was described as very slight. In fact, one of the witnesses in the Walker vehicle was not even aware that the rear end of his vehicle was struck by the Langla automobile until another person related this information to him. Walker also testified that no one appeared to be injured. After the investigation by the State Police, the Langla vehicle continued to its destination in New Iberia. Maturin testified that while he was in New Iberia he began to suffer pain in the neck, chest, left arm and head, as well as stiffness. After the parties returned to New Orleans, on April 18, 1967, they sought medical treatment from Dr. Jack C. Castrogiovanni.
The medical evidence relating to plaintiff's alleged epileptic seizures follows.
Dr. Castrogiovanni, who was stipulated to be an expert in the field of internal medicine, was the first physician to examine plaintiff Maturin. The history he obtained on the date of the first visit, April 18, 1967, reflects that the patient complained of severe headaches of the front and back of the head; blurring of his vision, with two previous episodes of not being able to see out of his right eye which had cleared before the day of the examination; nausea, vomiting, and dry throat, with difficulty in swallowing; weakness with dizzy spells; chest pains upon taking a deep breath; loss of feeling in the right side of his face; and pain and stiffness of his neck and upper back regions, as well as discomfort of his low back region. In addition, he was very nervous and had difficulty in sleeping. The clinical impression of Dr. Castrogiovanni was that plaintiff had sustained an acute cervical strain with associated muscle spasm and bilateral trapezius muscle spasm, a contusion of the anterior of the chest, mild lumbosacral strain, and moderate acute anxiety reaction. He did not regard the numbness over the right side of the face as an unusual finding in severe cervical strains of the neck. However, he did not understand why plaintiff complained of difficulty with his vision. He stated that he was given no history of a direct blow or trauma to the head, and when questioned as to whether a "whiplash" motion of the accident could result in some internal damage to the brain replied in the negative. On Dr. Castrogiovanni's recommendation Maturin was admitted to the Montelepre Memorial Hospital and received treatment there over a period of twenty-five days.
Dr. Castrogiovanni also stated that convulsions were not reported to him during the time he treated plaintiff. As to the later development of traumatic epilepsy diagnosed by Dr. Raeburn C. Llewellyn, he testified that on the basis of the history and physical examinations throughout the time he saw plaintiff he observed nothing to suggest that Maturin suffered a trauma to the head or a lesion that might lead to epilepsy, nor did plaintiff complain of an aura or epileptic seizure. However, he admitted it is not unusual to have a completely negative neurological examination and to end up with a lesion on the brain which would result in epilepsy.
Dr. Castrogiovanni referred Maturin to Dr. Raymond Haddad for orthopedic evaluation and x-ray evaluation, stating he did not feel plaintiff needed neurological evaluation at that time.
As a result of his examination, Dr. Haddad felt that plaintiff had suffered a severe *862 cervical and dorsal paravertebral muscle strain. Because plaintiff complained of weakness of the muscles of the right side of the face near the mouth, Dr. Haddad recommended a neurological evaluation.
On Dr. Haddad's recommendation, Dr. Raeburn C. Llewellyn was called in as a consultant.
The deposition of Dr. Llewellyn was offered into evidence and at the time it was taken he was Professor and Chairman of the Department of Neurological Surgery at Tulane University. He stated he first saw Maturin on April 19, 1967, and followed him during his stay in the hospital. After plaintiff's hospital treatment, he felt that he should be treated as an outpatient for a cervical injury.
He next saw Maturin on June 29, 1967, and was still of the opinion his complaints represented a residual of cervical spine strain.
Approximately a year and eight months later, on February 21, 1969, plaintiff was again examined by Dr. Llewellyn and at that time informed the doctor that he had been placed on anticonvulsant medication due to seizures he had been experiencing. At this time the doctor caused to be conducted an electroencephalogram which was interpreted by both the electroencephalographer and Dr. Llewellyn as being slightly abnormal.
On October 15, 1969, plaintiff was examined by the doctor for the Division of Vocational Rehabilitation, and at that time Dr. Llewellyn felt that plaintiff was anxious and nervous to the point of being incomprehensible. It was his opinion that Maturin was totally incapacitated with what he felt was an organic brain disorder, manifested chiefly by agitation, depression, and marked feelings of nervousness and insecurity.
Dr. Llewellyn's next examination of Maturin occurred on November 3, 1969, when another electroencephalographic tracing and re-examination was done. This examination was reported as normal.
The final visit of Maturin to Dr. Llewellyn was on April 2, 1971, when plaintiff still complained of neck, shoulder and left arm pain associated with occasional numbness. However, he stated he felt plaintiff's problem with his neck had improved, although Dr. Llewellyn noted some spasm of the left lateral cervical muscle, tenderness of the left brachial plexus, a mild grip deficiency, and some tenderness of the left median nerves. Inasmuch as muscle spasm was still present some four years after the accident, the doctor was of the opinion plaintiff had experienced a significant cervical strain but his opinion concerning plaintiff's incapacity was that it was not due so much to the neck injury as to evidence of a brain syndrome.
On cross-examination he admitted that the finding of a slightly abnormal electroencephalogram in February of 1969 was not typical of post-injury epilepsy but of a nonspecific etiology. He also stated that a question existed in his mind as to whether Maturin's symptoms were a form of nervous reaction to the injury or true seizures. Concerning whether plaintiff's post-traumatic convulsive problem was the result of this particular accident, the doctor stated there would have to be some conjecture as to his seizure problem being so caused, but in the absence of any other known etiology for such problem, added to the fact that he had sustained a significant injury to his neck and head, then he thought it proper to attribute the seizure problem to the brain injury.
Dr. Gerald J. Elias, a general practitioner of New Iberia, Louisiana, was called as a witness for plaintiff. His first occasion to treat Maturin was on June 10, 1968, approximately fourteen months after the accident. On this occasion plaintiff was complaining of stiffness and pain in the neck and having convulsive type seizures. The description of the seizures that he obtained indicated that Maturin became very anxious *863 and agitated and would then fall out, having vigorous motions with his hands and feet.
His examination revealed that Maturin had twenty percent restriction of motion of the neck in all directions. Plaintiff had no definite muscle spasm but rather muscle contracture of the paracervical muscles with tenderness along the spinous process of the cervical vertebrae. The muscle contracture was described as "just a shortening of the muscle bundles, and not really [their] having spasm on movement." The doctor attributed this condition to chronic illness, resulting in plaintiff's holding the joints in one position and thus allowing a shortening and atrophy of the muscles to occur.
Dr. Elias prescribed tranquilizers, muscle relaxants and analgesics and started Maturin on Dilantin, an anticonvulsive drug. At this time he prescribed one tablet containing one hundred milligrams of Dilantin to be taken once per day. He stated the tablet was a trial measure and if improvement resulted, further investigation would be sought. Ten days later Maturin saw Dr. Elias and reported only two seizures, thus attributing his improvement to the medication which he had been administered. The doctor noted that prior to that time Maturin had reported having four to six convulsions per day, although there was no history concerning when the first convulsion occurred.
Dr. Elias saw plaintiff again on December 2, 1968, when plaintiff related that he had attempted to return to work but that working had made him very anxious and agitated and seemed to bring on convulsions. At this time Dr. Elias recommended that plaintiff stop working.
After Dr. Llewellyn's examination and the electroencephalogram was done on his recommendation, the Dilantin was increased from one capsule of one hundred milligrams a day to three capsules per day. As a result of this increased medication, Dr. Elias stated that Maturin had fewer seizures, averaging one, or rarely two, a month after the Dilantin was increased.
It was Dr. Elias' opinion that Maturin's cervical problem should not prevent him from working, although it might hamper him in some respects. Finally, Dr. Elias expressed the opinion that plaintiff had a post-traumatic convulsive disorder and that he thought Maturin was totally incapacitated as far as earning a livelihood was concerned. He estimated that medical costs for the management of plaintiff, including medication but excluding psychotherapy, would average approximately $800 to $900 per year. This would be a necessary expense, he said, for the remainder of Maturin's life.
It is obvious from Dr. Elias' testimony that he based his diagnosis on what plaintiff related to him concerning his seizures, on plaintiff's statements relative to the anticonvulsant lessening the frequency of the seizures, on the report of the slightly abnormal electroencephalogram, and on plaintiff's statement that he had not had such seizures prior to the accident.
On cross-examination, while he did state that epilepsy was a result of scarring on the brain which could emanate from trauma, either minor or severe, he also stated that where the injury was minor, it would be impossible for a physician to say with certainty that this was a cause of traumatic epilepsy. He further testified that plaintiff's epilepsy could be idiopathic rather than traumatically induced.
Dr. William P. Cloyd, Jr., a specialist in neuropsychology and psychiatric treatment, testified in behalf of plaintiff by means of his deposition. The plaintiff Maturin was referred to Dr. Cloyd by his counsel. The doctor stated that he examined Maturin initially on July 13, 1969. In connection with his examination, he reviewed extensive medical reports from physicans who had been treating Maturin. On his first interview Dr. Cloyd said Maturin appeared quite nervous, shakey, and somewhat confused. It was his understanding that Maturin *864 had a convulsion on the day of this examination. He further described the patient as being dull mentally.
On the second visit he stated plaintiff appeared to be more alert and could relate a more meaningful history than he had on the first occasion. However, on this visit Maturin was profoundly depressed. On both visits plaintiff seemed primarily preoccupied with his physical well-being and inability to work.
The doctor's opinion based on these two visits of plaintiff and on the history obtained from Maturin's wife was that plaintiff had a chronic brain syndrome associated with epilepsy and a post-traumatic neurosis. He also thought that in the absence of the trauma sustained in the accident the emotional illness would not have presented itself, nor would any physical illness have developed. He felt there was no attempt on plaintiff's part to elicit sympathy and did not feel that he was a malingerer.
Additionally, he testified that based on the history he had obtained it would indicate that Maturin did have an epileptic condition which was in relationship with the accident and that there was no preceding history of any neurological symptoms. He further stated that plaintiff's emotional reactions of anxiety, depression, and physical preoccupation and concern about his health and well-being certainly comprised what he considered to be a post-traumatic neurotic condition.
Dr. Cloyd further stated that the prognosis for plaintiff's ability to work in the future was very guarded and that he believed Maturin needed long-standing, continued drug therapy, both for his organic, physical epileptic condition and for his emotional symptoms. He further thought he needed supportive psychiatric treatment, in addition to the drug therapy, for the control of the seizures resulting from the organic brain damage.
He testified on cross-examination that it would be difficult to relate the seizures to the automobile trauma if the history were to be altered to state that the first spell or seizure did not occur until some nine months after the accident. He further testified that if the first seizure occurred nine months after the accident, he could not say with any degree of medical certainty that the seizures were related to the accident.
Later in Dr. Cloyd's testimony and prefaced by a long description of plaintiff's history and symptoms, counsel asked the doctor if his impression were that there could be a causal relationship between the trauma and the development of seizures even though they came six, seven, eight or nine months after the trauma. To this question Dr. Cloyd replied, "I feel there would be a causal relationship."
With regard to the possibility of Maturin's faking his symptoms, Dr. Cloyd concluded, "If I may say, he has too many good typical symptoms of having an epileptic condition unless he had done quite a bit of reading in medical books."
Finally, he answered that in the absence of any other trauma or possible condition his opinion was that plaintiff's seizures were causally related to the accident.
Dr. Richard Warren Levy, a witness in behalf of defendants, testified as a qualified specialist in neurosurgery.[3] He examined Maturin on January 26, 1970, and stated his examination was long enough to get a complete, detailed history and to do a complete, detailed neurological examination.
He testified that plaintiff complained of pain in his left arm, neck and chest, stating there was numbness of the left hand and weakness and stiffness of the left arm. Maturin also complained to him of frequent headaches which were more to the left side of the head, as well as pain in the mid-back area. Dr. Levy had previously *865 treated Maturin for a back injury in 1962, and on the 1970 examination Maturin told him that he had never recovered from the previous injury.
Dr. Levy interviewed plaintiff as well as plaintiff's wife with regard to his fits or spells. Maturin could not describe the spells to him and stated he did not know what happened during the time they occurred because he was not awake. Mrs. Maturin told Dr. Levy that her husband suddenly fell to the floor when he was having a seizure; his body stiffened, without any jerking movements of any part of his body; and he frequently held his hands over his head in a stiff position until the fit was over. She further said the spells lasted anywhere from three to four minutes up to ten minutes. Dr. Levy questioned Maturin as to whether he had ever bitten his tongue or lost control of his bladder or bowel function during one of his spells but plaintiff answered in the negative. Maturin also denied ever having had a spell before the accident.
With regard to Dr. Levy's impression of plaintiff and his illness, he stated:
"* * * I noted that Mr. Maturin had a multitude of complaints following an accident on April 19, 1967. And I noted particularly that the description of the fits as given to me, did not conform to any known type of convulsive disorder or seizure or epilepsy. Therefore, I did not think that he should be treated as though he had a convulsive disorder or epilepsy, and specifically I saw no reason for him to take a drug Dilantin, which is an anti-epileptic drug. My neurological examination revealed no sign of organic, that is to say physical or structural disease, or injury of the brain, spinal cord, or nerve roots coming from the spinal cord. Based on that examination it was my opinion that he did not have a neurological disability attributable to the accident of April 19, 1967. I did not have any additional neurological diagnostic studies to recommend, nor did I think that any neurosurgery would be helpful to Mr. Maturin." (Record, p. 915)
Dr. Levy was questioned extensively with regard to the characteristics of epilepsy and the nature of epileptic seizures or convulsions. Concerning the aura which precedes such seizures, plaintiff had previously testified that prior to such a seizure he would become agitated and nervous. Dr. Levy stated that nervousness and agitation do not fit within the characteristic pattern of an aura with which he was acquainted. He further testified that an individual with a true aura who has the symptoms of "nausea or a feeling that he is not where he actually is" may become upset because he knows a seizure is going to happen and become agitated and nervous. However, he did not feel agitation and nervousness alone were characteristic.
Dr. Levy stated that trauma can be the cause of epilepsy but it should be sufficient to produce a scar on the brain surface, and the scar would serve as an irritating focus for the seizure disorder. Those types of trauma described by him as sufficient to cause epilepsy were a penetrating injury of the head or skull, either a missile or depressed fracture in which the bone of the skull is pushed in toward the brain and tears or cuts the brain surface; a severe bruise of the brain which produces a scar on the brain surface; or a hemorrhage of the brain producing at the site of the hemorrhage a scar on the brain surface.
He also testified that it is possible for a severe contusion of the brain to occur in a closed head injury. However, for such a head injury to produce post-traumatic epilepsy, the injury would have to be serious enough to render the person unconscious from hours up to days, according to his testimony.
In describing the diagnostic aspects of the electroencephalogram with respect to post-traumatic epilepsy, he stated the electroencephalogram should be abnormal and show reduced electrical activity, or in electroencephalographic terms "a slow wave" *866 (indicative of no brain tissue that is functioning), surrounded by a ring of increased electrical activity, which is shown by a spike wave form. The remainder of the electroencephalogram should be normal. The increased electrical activity represents the irritation the scar causes on surrounding brain tissue, and when the irritation is severe enough, the individual has a seizure. Once the scar tissue forms on the brain of the person it remains with the patient and does not become smaller or larger. The sole purpose of Dilantin is to reduce the irritability of the abnormal brain tissue around the scar and to put a damper on brain irritability, which, in turn, reduces seizure activity. In other words, considering that plaintiff had a slightly abnormal electroencephalogram on February 27, 1969, and that he subsequently had a completely normal tracing on November 3, 1969, Dr. Levy stated it was his opinion he did not have epilepsy.
Dr. Levy further testified that one Dilantin pill does not work for a convulsive problem and explained that Dilantin must be taken regularly without fail to be effective, two, three or four times a day over a period of months or years. According to his testimony, it requires forty-eight to seventy-two hours before the blood level of Dilantin would become high enough to reduce brain irritability so that if an individual comes to an emergency room having a first seizure the thing not to do is immediately administer Dilantin capsules or injections to stop the seizure because it would take two or three days to build up the level of Dilantin in the bloodstream. He also stated that taking Dilantin when an aura began would not stop the seizure and that if a patient were on the Dilantin whose blood level of it sank low enough so that he could have a seizure, taking one pill would not raise the level fast enough to prevent the seizure.
To the question of whether there was any way to be certain from a medical standpoint of the relationship of the trauma to subsequent convulsions when the convulsions had their onset approximately a year after the trauma, Dr. Levy answered in the negative. He was also of the opinion that unconsciousness would be present for hours or days associated with or without the penetrating injury to the skull. When counsel asked if he had ever seen a patient with a whiplash type of injury who developed epilepsy related to trauma without evidence of head trauma such as he had described, Dr. Levy stated that he had not.
Maturin testified that he had vomited on the morning of the day he first visited Dr. Castrogiovanni, or April 18, 1967. In connection with this, Dr. Levy stated that vomiting immediately after an injury is a sign of brain injury and that it would manifest itself within minutes to hours afterward. Vomiting that first occurred seventy-two hours after an injury, in his opinion, would not be related to the trauma. Vomiting within thirty-six to forty-eight hours or even later, according to the doctor, could result from swelling of the brain caused by a complication of a head injury. Dr. Levy further said that although a person with a severe whiplash commonly experiences headaches, he had not heard the complaint of vomiting from this cause.
Counsel asked if the doctor was saying that a person who has a severe whiplash injury cannot sustain damage to the brain, and he answered, "There's no always and no never in medicine * * *. I am saying that in my experience it doesn't happen."
Prior testimony had shown that the patient's false teeth were removed after a seizure began, and Dr. Levy testified that he did not think it would be possible to remove the teeth of a person having a grand mal seizure, inasmuch as the strongest muscles in the body are the masseter muscles that close the jaws. These muscles are so strong, he said, that they could take the tip of a person's finger off when a person was having a seizure. He thought that anyone placing a finger in the mouth *867 of a person having a seizure would find the tip of his finger gone. He said he did not believe that teeth could be removed from the mouth of a person "having a true epileptic seizure." Plaintiff Maturin had testified previously that the sides of his mouth had been injured or broken by the members of his family in attempting to remove his false teeth when he had a seizure, but Dr. Levy testified, "I know you can't wedge the mouth open [to remove the teeth], and the reason I know it is having seen many, many people with seizures, and having attempted to keep their teeth from coming together, it just isn't possible. It just isn't possible."
Concerning whether Dr. Levy would criticize Dr. Elias for prescribing one Dilantin capsule a day for Maturin, he testified as follows:
"Q Well, if you were a poor general practitioner in a country town, and couldn't get to a neurosurgeon, and a man came in having what was described as epileptic seizures, would you criticize that general physician for starting him off on a small dose of Dilantin?
"A I don't mean to be critical of any physician. I simply tell you that the effectiveness of Dilantin in an individual having seizures three or four times a day is miniscule with one capsule being administered." (Record, p. 946)
When counsel further described plaintiff's symptoms, complaints and seizures in detail and asked if they would not present a picture of epilepsy following trauma, Dr. Levy answered that they would not "because the sine qua non of epilepsy following trauma is trauma sufficient to produce a scar on the brain surface, and what you have said to me so far has not indicated any trauma sufficient to produce scarring on the brain surface, and hence post-traumatic epilepsy."
Dr. Levy remained firmly of the opinion that a person has to be rendered totally unconscious or have a penetrating injury of the skull to develop traumatic epilepsy.
In rebuttal, Dr. Homer D. Kirgis testified for plaintiff as an expert in the field of neurosurgery. Although Dr. Kirgis had never seen or examined Maturin, the obvious purpose of his testimony was to rebut the prior testimony of Dr. Levy.
When counsel related a history of the symptoms of the plaintiff, Dr. Kirgis stated they could be considered as classic symptoms for those preceding a seizure. Dr. Kirgis did not concur with the medical opinion of the defendants' witness that post-traumatic epilepsy was not a possibility unless such a patient had been rendered unconscious at the time of injury. Additionally, he would not conclude that a man could not be suffering from post-traumatic epilepsy because his wife had been able to remove his dentures during one of the seizures. He did state it is well known that epilepsy is more likely to follow an injury to the brain if there has been a period of unconsciousness and particularly if there has been a penetrating would of the brain and especially if there has been some degree of infection associated with the injury. However, he stated it was really not uncommon for epilepsy to follow an injury to the brain which did not cause loss of consciousness at the time of the accident. Because the injury might be to one of the parts of the brain not important as far as consciousness is concerned, according to him, it would not necessarily cause a loss of consciousness but could easily cause seizures at a later date. This is particularly true, he said, of injuries to the brain stem. According to his testimony plaintiff's symptoms suggested "quite strongly" that the seizures were emanating from or the primary injury might have been an injury to plaintiff's brain stem. He felt that possibly the seizures were emanating from the deeper areas of the brain termed the basal nuclei or basal gangli or the brain stem itself. Dr. Kirgis had treated a patient with post-traumatic epilepsy who had not been rendered unconscious by the injury and his *868 treatment was the same, i. e., the use of Dilantin or other anticonvulsants.
Additionally, Dr. Kirgis testified that some persons do not even clench their jaws during a seizure or at least not very extensively. He further explained that during the tonic phase of a seizure the jaws are closed firmly and it is very difficult to remove the teeth or insert something between the teeth. However, during the clonic phase of the seizure, after the tonic phase is past, it is often possible to remove the teeth without too much difficulty. He added that it is very dangerous to try to remove the teeth from a person having a seizure, as one might break the patient's teeth or sustain a bite to the remover's fingers.
Dr. Kirgis also testified it is not likely that the administration of one capsule of Dilantin would abate a seizure when a person goes into an aura or feels a seizure coming on unless he had been taking Dilantin before and then it would depend on how long the aura continued. If the aura lasted only a few seconds before seizure, it would not help. However, some people will demonstrate evidence of a seizure several hours before they actually experience one, and in those cases he felt certain some additional Dilantin taken at that time might help. He testified that if a patient had an aura of approximately a minute and took Dilantin during that minute, it would not stop the particular seizure.
Of all the foregoing medical evidence reviewed by us, only Drs. Levy, Elias and Kirgis testified in court, all of the others having testified by deposition. Of these Dr. Elias, although equivocal in some respects, was of the opinion plaintiff suffered from traumatic epilepsy, while Dr. Levy, only an examining physician, unequivocally was certain that he did not. Dr. Kirgis, as noted above, did not examine the plaintiff. While Dr. Elias was the treating physician, it is to be noted that he did not begin his treatment of plaintiff until approximately fourteen months after the accident. It is obvious that Dr. Elias treated plaintiff's symptoms and based his diagnosis on what had been related to him by plaintiff concerning his spells. His first treatment of plaintiff for traumatic epilepsy was to prescribe one Dilantin pill per day. The evidence reveals that Dilantin is a blood level drug and to be effective to prevent seizures must attain a certain level in the blood. After consultation with Dr. Llewellyn, the Dilantin dosage was increased to three capsules per day. Dr. Llewellyn felt there was some conjecture as to whether plaintiff's seizures were solely produced by the injury he received, but in the absence of any other known etiology for the seizure problem he thought it would be proper to attribute the seizures to the accident. To the same effect is the testimony of Dr. Cloyd, who felt that in the absence of trauma plaintiff would not have had a chronic brain syndrome associated with epilepsy and post-traumatic neurosis. Dr. Castrogiovanni, who initially treated plaintiff, was obviously not impressed that plaintiff received any head injury, as he treated him for a cervical strain.
The trial judge gave no written reasons for rejecting plaintiff's claim of traumatic epilepsy, but we feel certain he must have been impressed that plaintiff did not receive sufficient trauma to the head to cause a scarring on the brain. Plaintiff's initial medical treatment after the accident revealed there was no suspicion on the part of his physicians of an injury sufficient to cause scarring of the brain. In addition, such a symptom did not reveal itself until at least nine months after the accident, nor was he treated specifically for such an illness or symptom until fourteen months after the accident, thus lending doubt as to traumatic epilepsy being caused by the accident. Upon further considering the "but for the accident" type of testimony of some of the medical witnesses, we feel that the trial judge was not manifestly erroneous *869 in concluding that plaintiff did not prove such an injury by a preponderance of the evidence.
The trial judge also had the benefit of seeing and hearing the plaintiff and his lay witnesses as they testified, and while we have no doubt that plaintiff and his witnesses accurately described plaintiff's symptoms, we would be hard pressed to substitute our judgment for the trial court's by concluding these particular symptoms were caused by the accident.
To paraphrase Justice Dixon in Fox v. State Farm Mutual Automobile Insurance Company and James C. Lewis, 288 So.2d 42, Supreme Court of Louisiana, handed down December 3, 1973: "We are not convinced that the [judge] jury was mistaken."
Justice Tate reaches the identical result in an eloquent discussion of the doctrine of manifest error in that article entitled "`Manifest Error'Further observations on appellate review of facts in Louisiana civil cases," 22 La.L.Rev. 605, from which we quote:
"In such instances, where the result reached is reasonably within a discretionary range of factual interpretation by the trial court, the appellate judge must in my opinion defer to the trial court's conception of the just result, though it differ from his own. By doing so, he recognizes that the judicial system serves the public interest better by assuring a greater stability of judicial determinations than ensues when appellate judges generally assume a greater power of review by substituting their own no less fallible judgment for the trial court's when there is a reasonable basis for the latter." (22 La.L.Rev. at 612)
By one view, the plaintiff in this case did not prevail in his claim of traumatic epilepsy for the reason that our review of the facts failed to convince us that the trial judge was mistaken. By another view, there was credible evidence to support the trial judge's judgment, thus the result was within his discretionary range of factual interpretation and, for that reason, not manifestly erroneous.
Although plaintiffs have specified as error the mathematics used by the trial court in computing the special damages, they fail to furnish any support for this proposition. The trial judge granted to plaintiff Maturin judgment for $8,077.97, as head and master of the community of acquets and gains formerly existing between him and his deceased wife, and awarded an additional $650 to him for the injuries to his wife. Of the $8,077.97 award, $6,500 represented the sum for general damages, leaving by simple arithmetic the sum of $1,577.97 as special damages. Beyond any question the trial judge rejected all special damages except those which he believed to be reasonably connected to the plaintiff's cervical strain, thus rejecting all special damages related to the traumatic epilepsy which he found to have no causal connection to the accident.
We find no error by the trial court in disallowing as special damages those expenses for the treatment of conditions found by the trial court not to be causally connected with the accident. Vauquelin v. Lumbermens Mutual Casualty Company, 193 So.2d 303 (La.App. 1st Cir. 1966).
However, we disagree with the trial court in its award of expert witness fees. The expert witnesses for the plaintiff were: (1) Dr. Castrogiovanni, (2) Dr. Llewellyn, (3) Dr. Elias, (4) Dr. Cloyd, and (5) Dr. Kirgis. The trial court awarded expert fees to Drs. Castrogiovanni and Llewellyn of $100 each, to be taxed as costs, while disallowing any such fees as costs to Drs. Cloyd, Elias and Kirgis.
Although the judgment of the trial court is not enlightening as to the reasons for allowing or disallowing expert fees to be taxed as costs to the various doctors, undoubtedly the expert fees of Drs. Cloyd, *870 Elias and Kirgis were disallowed because their testimony related mainly to the traumatic epilepsy found by the court not to be causally connected to the accident.
We are unable to agree with this position. LSA-R.S. 13:3666 providing for the compensation of expert witnesses requires that compensation for such testimony be fixed by the courts with reference to the value of the time employed and the degree of learning or skill required.
The identical question was presented in Glass v. Aetna Casualty and Surety Company, 166 So.2d 552 (La.App. 4th Cir. 1964), from which we quote:
"We now address ourselves to the question of fees. The trial court refused to tax as costs expert witness fees, otherwise taxable, for Drs. Smith and Lubin for the reason that these witnesses testified only as to plaintiff's mental condition and plaintiff has failed to sustain the burden of proving a causal connection between that condition and the accident. We are of the opinion that this is not a sufficient reason for disallowing expert witness fees. The fee of an expert should be taxed as costs (under LSA-R.S. 13:3666 which trac[k]s its source, Act 19 of 1884) even though the expert's opinion was not accepted by the court and even though, on the issue concerning which he testified, the defendant was successful. City of New Orleans v. Salcedo Oil Co., La.App., 94 So.2d 156. * * *" (Glass v. Aetna Casualty and Surety Company, 166 So.2d at 555, 556)
Accordingly, we award each of the following expert witnesses a fee of $100: Drs. William P. Cloyd, Jr., Gerald J. Elias, and Homer D. Kirgis. This is consistent with the trial judge's award to the other expert witnesses who were granted expert witness fees.
Having allowed the expert witness fee of Dr. Cloyd, we also award $56 as costs for the court reporter who transcribed his testimony for use in court.
For the reasons assigned, the judgment of the trial court is amended only insofar as to tax as costs against the defendants expert witness fees of $100 each for Drs. William P. Cloyd, Jr., Gerald J. Elias and Homer D. Kirgis and the additional sum of $56 for court reporter costs. In all other respects, and as thus amended, the judgment appealed from is affirmed, with the plaintiffs to pay the costs of this appeal.
Amended and as amended, affirmed.
NOTES
[1] Pursuant to a post trial conference held on July 28, 1972, a joint motion and order was filed wherein George Breaux was recognized as the owner of an undivided one-half interest of an undivided one-half interest in and to the community of acquets and gains formerly existing between Gloria Maturin and Leroy Maturin, by virtue of a judgment of possession attached thereto in the "Succession of Gloria Jane Breaux Maturin," being Probate No. 8781 on the docket of the 16th Judicial District Court of the Parish of Iberia.
[2] James Quatroy, owner of the Chevrolet, was originally made a party defendant but was voluntarily dismissed from the suit by plaintiffs.
[3] After Dr. Levy's testimony was concluded, the trial judge stated for the record that he had testified for some three hours.